J. S38013/14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| DARRYL D. BLACK, | : | No. 2183 EDA 2013 |
| | : | |
| Appellant | : | |

Appeal from the PCRA Order, June 28, 2013,
in the Court of Common Pleas of Philadelphia County
Criminal Division at No. CP-51-CR-1206101-2005

BEFORE:  FORD ELLIOTT, P.J.E., BOWES AND SHOGAN, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:  **FILED AUGUST 27, 2014**

Darryl D. Black appeals from the order of June 28, 2013, dismissing his PCRA[1] petition without a hearing.  We affirm.

The facts of this matter have been aptly and thoroughly summarized in a prior opinion by the trial court, the Honorable M. Teresa Sarmina, as follows:

> On July 29, 2003, at around 7:30 pm, James Scott (hereinafter, victim) was shot to death in broad daylight in his row home located at 2219 Uber Street, in Philadelphia.  He was shot seven times -- three times in the back, twice in the left arm and one time each in both the chest and the right thigh.  The victim was rushed to Temple University Hospital where he was pronounced dead on arrival.[Footnote 5]

---

[1] Post-Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-9546.

[Footnote 5] The medical examiner concluded that the cause of death was multiple gunshot wounds. One base jacketed medium-sized hollow point bullet caused massive hemorrhaging after entering the victim's body through the lower back, penetrating his diaphragm, twelfth rib, and lower right lung, bouncing off of the vertebrae in the thoracic spine, piercing the upper right lung and the sub-clavian artery and, finally, lodging in the victim's neck.

The shooting punctuated a series of arguments that had escalated over three or four days before the shooting incident between the victim and his neighbors, Sherron Dennis[Footnote 6] and Carline Izzard. On the day of the shooting, Sherron Dennis, Teia Dennis, Ms. Izzard, and the victim were at Sherron Dennis' home. [Appellant] was invited, but had not yet arrived.[Footnote 7] An intense argument erupted involving Sherron Dennis, Ms. Izzard and the victim. The victim left Sherron Dennis' residence and returned home. After [appellant] arrived, Sherron Dennis told him of the dispute she had with the victim. [Appellant] asked her the whereabouts of the victim, and she told him that "[the victim] was probably upstairs in his house." At that point, [appellant] -- perceptibly angry -- walked off toward Susquehanna Avenue.

[Footnote 6] This witness' first name is spelled "Sherron" in the certified record, though it also appears on various exhibits, and in the Quarter Sessions file pertaining to her solicitation charge, as "Sharron." She will be referred to herein as "Sherron Dennis."

[Footnote 7] [Appellant] was Sherron Dennis' sister's (Teia) boyfriend.

Thereafter, at just before 7:30 pm, a second argument ensued between the victim, who was on

the front step of his home, and Sherron Dennis. As the victim argued, [appellant] approached on Uber Street from the direction of Susquehanna Avenue. Since he had left Sherron Dennis' house, [appellant] had changed into a black hoodie and black glasses. When [appellant] arrived in front of the victim's home, he started shooting.[Footnote 8] Three bullets passed through the victim's body and exited through the back of his t-shirt. The victim spun around and retreated inside his home. [Appellant] followed the victim into the residence, and closed the door behind them. Several more shots were heard. Shortly thereafter, [appellant] exited the victim's residence.

> [Footnote 8] Shortly before the shooting, Kenneth Collins and a few family members and friends had gathered around the front step of his residence at 2311 North Uber Street. Collins was seated on the step. A stocky male passed by them at a distance of approximately six or seven feet coming from Susquehanna Avenue on Uber Street headed toward the victim's home. All of his clothing was black. The man stopped in front of the victim's home, raised his arm and began shooting at the victim. Upon hearing the shots, the gathering in front of Collins' residence dispersed, and Collins scrambled into his home. Once inside, Collins heard several more gunshots.

Coincidentally, at that same time, Officers Ronald Gilbert and Aaron Green of the Philadelphia Highway Patrol, were parked in their marked patrol car at the intersection of Susquehanna Avenue and Uber Street.[Footnote 9] As soon as the shots rang out, they looked in the direction of the incident and saw the shooter firing from the pavement into the residence at 2219 Uber Street. They exited their patrol car and ran toward the scene, but the shooter disappeared into the house. As they closed in on the

residence, [appellant] emerged from the house.[Footnote 10] [Appellant] fired one shot directly at Officer Gilbert, but missed, and then [appellant] ducked for cover. He ran across the street, past S.J. who was outside playing with a ball,[Footnote 11] and into a parking lot. Officer Gilbert observed [appellant] standing next to a dumpster with his gun drawn and he fired four shots at [appellant], but missed.[Footnote 12] [Appellant] fled to the 2200 block of 20th Street where he disappeared from the officers' view.

[Footnote 9] They were there to execute a warrant at a location unrelated to this incident.

[Footnote 10] Officer Gilbert testified that he was able to observe the shooter at this point for a period of approximately five (5) to ten (10) seconds. He identified him from a photo array.

[Footnote 11] This witness' full name appears in the certified record; however, she will be referred to herein by her initials, S.J. *See* Commonwealth v. Bryson, 860 A.2d 1101, n 2 (Pa.Super. 2004). Twelve year old S.J. was playing with a ball with her friends in a lot located between Uber and 20th Streets. She overheard a verbal dispute between "the man that got shot, and some lady." At one point, the ball rolled away and was retrieved by a man walking by. She then observed as the same man proceeded to "shoot[] at the man that was arguing with the lady." "He didn't just stand on the pavement and shoot. He walked up two steps and shot into the house." She gave a statement to police later that night.

[Footnote 12] Officer Green never fired his weapon.

During the investigation of the area outside of 2219 Uber Street, Officer Leo Everett Rahill, of the Crime Scene Unit, recovered ten (10) fired cartridge cases and five (5) spent bullets. Inside, he located four (4) more fired cartridge cases and one additional (1) spent bullet.[Footnote 13] A Keltec P-11 .9 millimeter semiautomatic handgun was recovered from behind the dumpster, next to where [appellant] had been standing. Officer John Cannon, of the Firearms Identification Unit, examined the firearm and the ballistics evidence and concluded that the three (3) spent bullets recovered from the victim's body were fired from the handgun found near the dumpster.[Footnote 14]

[Footnote 13] A spent bullet was also retrieved from the window frame of a nearby residence.

[Footnote 14] The recovered Keltec firearm did not contain any fingerprints that could be used to identify the shooter. Officer Cannon concluded that ten (10) of the fired cartridge cases (hereinafter, FCC) recovered, and five (5) of the spent bullets recovered, had been fired from the Keltec firearm. He further concluded that four other (4) FCCs, and two (2) spent bullets were fired from Officer Gilbert's Glock. Two (2) spent bullets were inconclusive as to whether they had been fired from the Keltec firearm, although they had *not* been fired from Officer Gilbert's Glock. Two (2) additional spent bullets were inconclusive as to whether they had been fired from Officer Gilbert's Glock, although Officer Cannon concluded that they had *not* been fired from the Keltec firearm.

Later that night, S.J., Kenneth Collins[Footnote 15] and Officer Green[Footnote 16] gave statements.[Footnote 17] The next day, Ms. Izzard gave a statement. At that time, she described the arguments that had taken place leading up to the shooting, but did not describe nor indicate that she knew the identity of the shooter.

[Footnote 15] At that time, Collins described the shooter: "black, maybe about 30 or so. He was maybe five nine to five eleven, heavier than me, kind of stocky. I weigh 155 pounds. He was wearing black clothes, a long sleeve black shirt." He added, "I seem to remember that it was a hoodie and he had it up, and black pants. I didn't notice his sneaks, just that he was wearing all black."

[Footnote 16] At that time, Officer Green described the shooter as "a black man, about medium complected, five nine, five eleven, stocky build, bearded and low cut and a black sweatshirt and black pants."

[Footnote 17] Due to the discharge of his weapon, Officer Gilbert was not questioned until the investigation by Internal Affairs Division Shooting Team was concluded. Accordingly, Officer Gilbert gave a statement over a year after the shooting, in September of 2004.

The identity of the shooter remained unknown until the case was taken up in June of 2004 by Detective Timothy Bass of the Special Investigations Unit. On June 2, 2004, Detective Bass re-interviewed Ms. Izzard, and she was "very cooperative." She referred detectives to an individual whom she knew as "Teia [Dennis'] boyfriend" and provided a physical description of him,[Footnote 18] but did not know his name.

Thereafter, Detective Bass identified Teia Dennis' boyfriend as [appellant]. He prepared a photographic line-up which included [appellant's] image and, on September 23rd and 24th of 2004, presented it to Officer Green, Ms. Izzard, and Officer Gilbert, all of whom selected the image of [appellant] as the shooter.

> [Footnote 18] Ms. Izzard first suggested that Teia Dennis' boyfriend was the shooter during her June 2, 2004 interview. She was asked, "At any time during this argument did Sherron say that she was going to get somebody to hurt [the victim]?" She responded, "The whole time she was saying to [the victim], 'I got somebody for you.' She said it a couple of times, and [the victim] just said to Sherron 'go and get whoever you want, Sherron. I am not going anywhere,' to me. Sherron said to me, you know who I'm talking about, this dude will just walk up and shoot" -- "He don't even talk. Then Sherron said Teia's boyfriend. She said this to me like it's okay to just come out and talk about it." She was asked at that time, "The guy that shot [the victim], is that the same guy you know as Teia's boyfriend?" She responded, "By the description, I think it was him. By the way the guy looked, you know, physically and all that, I think it was him."

Shortly thereafter, Sherron Dennis was arrested on charges of criminal solicitation to commit murder,[Footnote 19] and identified [appellant] as the shooter.[Footnote 20] An arrest warrant was subsequently issued for [appellant].

> [Footnote 19] 18 Pa.C.S.A. § 902. This matter was captioned at CP-51-CR-0204221-2005.

> [Footnote 20] Pursuant to negotiations with the District Attorney's (hereinafter, D.A.) Office, Sherron Dennis agreed to identify [appellant] on the record, and to do to [sic] the same at [appellant's] trial, and in exchange the D.A.'s Office agreed to recommend a mere probationary sentence. A "proffer statement" was taken from her on November 30, 2004, in the presence of her attorney, David Nenner, Esquire, Assistant D.A., Anthony Voci (hereinafter, Voci), and Detectives Bass and Buckley. In that statement, she identified [appellant] as the shooter. She identified [appellant] by his nickname, "June." It was signed at that time both by Nenner, as Sherron Dennis' counsel, and Sherron Dennis. On April 18, 2005, Sherron Dennis appeared before The Honorable Benjamin Lerner and entered a plea of nolo contendere to solicitation. She was found guilty and received a probationary sentence. In April of 2002, Detective James Griffin had interviewed [appellant] in a matter unrelated to this case, at which time and [sic] [appellant] stated that his nickname was "June."

Trial court opinion, 8/4/08 at 2-6 (citations to the record omitted).

On December 11, 2007, following a jury trial, appellant was found guilty of first degree murder, aggravated assault, carrying a firearm without a license, and possessing an instrument of crime. Appellant was sentenced to life imprisonment for first degree murder, and a consecutive, aggregate sentence of 7 to 19 years for the remaining convictions. Appellant filed a timely direct appeal, and on April 20, 2009, this court affirmed. *Commonwealth v. Black*, 974 A.2d 1176 (Pa.Super. 2009) (unpublished

memorandum), ***appeal denied***, 983 A.2d 725 (Pa. 2009).  On November 5, 2009, our supreme court denied allowance of appeal.  ***Id.***

On August 12, 2010, appellant filed a timely ***pro se*** PCRA petition. Counsel was appointed and filed an amended petition on appellant's behalf. On June 28, 2013, following notice pursuant to Pa.R.Crim.P., Rule 907, 42 Pa.C.S.A., appellant's petition was dismissed.  This timely appeal followed.  Appellant has complied with Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A., and the PCRA court has filed an opinion.

Appellant complains that the PCRA court erred in dismissing his petition without an evidentiary hearing, where he would have been able to prove that he was entitled to relief due to trial counsel ineffectiveness.

> This Court's standard of review regarding an order denying a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. ***Commonwealth v. Halley***, 582 Pa. 164, 870 A.2d 795, 799 n. 2 (2005).  The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record.  ***Commonwealth v. Carr***, 768 A.2d 1164, 1166 (Pa.Super.2001).

***Commonwealth v. Turetsky***, 925 A.2d 876, 879 (Pa.Super. 2007), ***appeal denied***, 940 A.2d 365 (Pa. 2007).

> [T]he right to an evidentiary hearing on a post-conviction petition is not absolute. ***Commonwealth v. Jordan***, 772 A.2d 1011, 1014 (Pa.Super.2001).  It is within the PCRA court's discretion to decline to hold a hearing if the petitioner's claim is patently frivolous and has no support either in the record or other evidence.  ***Id.*** It is the responsibility of the reviewing court on

> appeal to examine each issue raised in the PCRA petition in light of the record certified before it in order to determine if the PCRA court erred in its determination that there were no genuine issues of material fact in controversy and in denying relief without conducting an evidentiary hearing. ***Commonwealth v. Hardcastle***, 549 Pa. 450, 454, 701 A.2d 541, 542-543 (1997).

***Id.*** at 882, quoting ***Commonwealth v. Khalifah***, 852 A.2d 1238, 1239-1240 (Pa.Super. 2004).

> To prevail on a claim alleging counsel's ineffectiveness under the PCRA, Appellant must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; and (3) that he was prejudiced by counsel's ineffectiveness, ***i.e.*** there is a reasonable probability that but for the act or omission in question the outcome of the proceeding would have been different. ***Commonwealth v. Kimball***, 555 Pa. 299, 724 A.2d 326, 333 (1999); ***Commonwealth v. Douglas***, 537 Pa. 588, 645 A.2d 226, 230 (1994).

***Commonwealth v. Bracey***, 795 A.2d 935, 942 (Pa. 2001).

In his first issue on appeal, appellant argues that trial counsel was ineffective for allowing the jury to review the police report of Officer Green, which was not in evidence. As the PCRA court explains, during their deliberations, the jury asked to see the original police reports of Officers Gilbert and Green. (PCRA court opinion, 12/6/13 at 7.) The court instructed the jury that Officer Green's report had neither been marked as an exhibit, nor moved into evidence, and therefore could not be provided to

them.  (***Id.*** at 8.)  The court told the jury to rely on their own recollection of Officer Green's testimony.  (***Id.***)

Shortly thereafter, the jury asked whether they could have portions of Officer Green's testimony pertaining to his statements in the police report read back to them.  (***Id.***)  At that point, trial counsel interjected, suggesting that the jury be allowed to view Officer Green's report instead of sifting through his testimony to find the relevant portions.  (***Id.***)  Trial counsel opined that it was better to just give the jury the entire statement.  (***Id.***, citing notes of testimony, 12/11/07 at 11-12.)  The trial court specifically asked appellant whether he was in agreement with counsel, and he responded in the affirmative.  (***Id.***)  The trial court also warned appellant that the matter could be considered immune from future collateral attack. (***Id.***)  Appellant stated that he understood.  (***Id.***)

> This Court has held that "a defendant who makes a knowing, voluntary, and intelligent decision concerning trial strategy will not later be heard to complain that trial counsel was ineffective on the basis of that decision." ***Commonwealth v. Paddy***, 569 Pa. 47, 800 A.2d 294, 316 (2002) (citing ***Commonwealth v. Abu–Jamal***, 553 Pa. 485, 720 A.2d 79, 93 (1998)).  To do otherwise, the Court held, "would allow a defendant to build into his case a ready-made ineffectiveness claim to be raised in the event of an adverse verdict." ***Id.*** In ***Paddy***, the defendant complained of trial counsel's ineffectiveness for failing to call alibi witnesses.  We held that "this ineffectiveness claim fails for the fundamental reason that Paddy agreed at trial to counsel's decision not to call the witnesses in question." ***Id.*** at 315.  As in this case, the trial court engaged Paddy in a colloquy as to the decision not to

> call the alibi witnesses. He replied that trial counsel had explained her decision not to call the witnesses and that he agreed. He further stated that he understood that he had a right to call the witnesses. We dismissed his claim, stating:
>
> > As Paddy expressed the view that the decision not to call alibi witnesses was his as well as trial counsel's, and his decision has not been shown to have been unknowingly, involuntarily, or unintelligently made, this allegation of ineffectiveness lacks arguable merit.
>
> *Id.* at 316.

**Commonwealth v. Rios**, 920 A.2d 790, 803 (Pa. 2007).

Similarly, here, appellant expressly agreed with trial counsel's strategic decision to allow the jury to read Officer Green's police report. He cannot now be heard to complain that it was the wrong decision.

Moreover, appellant cannot show how he was prejudiced. Appellant fails to point to anything in Officer Green's report that was prejudicial. In fact, in his initial report, Officer Green did not identify appellant as the shooter. Furthermore, Officer Green was cross-examined extensively regarding the statements he made in the police report, so the jury was already aware of the substance of those statements.

Appellant claims that allowing the jury to see Officer Green's report somehow violated his constitutional right of confrontation. However, as the PCRA court notes, appellant cross-examined Officer Green thoroughly regarding alleged omissions or inconsistencies between his initial statements

contained in the police report and his trial testimony. (PCRA court opinion, 12/6/13 at 9-10 n.27.) In fact, insofar as Officer Green's report described the shooter in very general terms and did not identify appellant as the shooter, appellant actually sought to draw the jury's attention to Officer Green's first statements, arguing that his memory was fresher at that time. (*Id.*) Appellant cannot possibly demonstrate how he was prejudiced by trial counsel's suggestion to give the jury Officer Green's police report, to which he assented.

Next, appellant argues that trial counsel was ineffective for failing to impeach Sherron Dennis ("Dennis") and failing to request a corrupt and polluted source instruction. Appellant states that Dennis was initially charged with murder but the charge was reduced to solicitation, with the recommendation of a probationary sentence, if she agreed to testify against him. In addition, Dennis was in custody on a probation violation when she testified. (Appellant's brief at 18-19.)

Appellant is simply mistaken. In fact, as the PCRA court explains, trial counsel did question Dennis regarding her plea agreement with the Commonwealth and the reduction in charges. (PCRA court opinion, 12/6/13 at 10-11.) Dennis testified that in exchange for having the charges reduced to solicitation and being freed on bail, she agreed to identify the gunman. (*Id.* at 11, citing notes of testimony, 12/4/07 at 212-215.) Trial counsel got Dennis to concede that someone being held for murder "will probably tell

somebody anybody to get out of jail." (***Id.***) Therefore, trial counsel thoroughly explored the issue of bias and Dennis' motive to testify.

In addition, trial counsel did request a corrupt and polluted source instruction and the trial court granted it. The trial court did instruct the jury that Dennis, as an accomplice, was a corrupt and polluted source and her testimony should be viewed with caution. (***Id.*** at 12; trial court opinion, 8/4/08 at 14-15, citing notes of testimony, 12/6/07 at 179-182.) Therefore, appellant's argument in this regard is without any basis in the record.

In his third and final issue on appeal, appellant argues that trial counsel was ineffective for failing to object to prosecutorial misconduct. Specifically, appellant contends that the prosecuting attorney expressed her personal opinion that one of appellant's witnesses was lying, and told the jury that not even appellant's attorney believed her. Appellant also argues that the Commonwealth committed prosecutorial misconduct by questioning Dennis about alleged threats by appellant.

One of appellant's witnesses, Jahnice Allen ("Allen"), testified that there was no argument the night of the shooting. In addressing Allen's testimony, the Commonwealth argued to the jury that it was undisputed that there was an argument between Dennis and the victim. (PCRA court opinion, 12/6/13 at 15-16, citing notes of testimony, 12/6/07 at 159-160.) The Commonwealth argued that Allen's testimony was incredible given that every other witness testified there was an argument involving Dennis,

Izzard, and the victim. (*Id.*) The assistant district attorney then remarked, "But what's interesting is you have to ask yourself, does he even believe her? Does [defense counsel] even believe her? Because what did he say, the first thing he said to you? Everyone agrees there was an argument on the street that night." (*Id.*)

The prosecutor's comments were within the bounds of oratorical flair. She was merely highlighting for the jury the fact that Allen's testimony was inconsistent with every other eyewitness, and even with defense counsel's own representations. It was not in dispute that an argument occurred. At no time did she imply that defense counsel was intentionally trying to mislead the jury or solicit false testimony. While the attorney for the Commonwealth argued that Allen's testimony was not believable, she never said that she, personally, did not believe her testimony. Appellant's claim lacks arguable merit.

Regarding the alleged threats, Dennis testified at trial that she could not remember whether she saw the man who shot the victim. This conflicted with her prior statement in which she identified appellant as the perpetrator. Dennis disavowed her prior statement, testifying that it was untrue. (PCRA court opinion, 12/6/13 at 14.) To explain why Dennis would be distancing herself from her prior statement, the Commonwealth asked Dennis about previous conversations she had with the district attorney's office, in which she alleged that someone had called her and threatened to

kill her and her children. (**Id.** at 13, citing notes of testimony, 12/4/07 at 193-195.) Dennis was placed in a hotel and given money to help her move. (**Id.**) Dennis denied telling Assistant District Attorney Anthony Voci that she had been threatened, but admitted that she was in fear. (**Id.**) Subsequently, ADA Voci was called to testify regarding his conversations with Dennis. ADA Voci testified that Dennis called him in a panic, stating that someone had threatened to kill her and her children if she came to court. (Trial court opinion, 8/4/08 at 20, citing notes of testimony, 12/5/07 at 183-184.) ADA Voci made arrangements with victim services to put Dennis and her family up in a hotel until such time as they could be relocated. (**Id.**) The trial court gave the jury a limiting instruction, cautioning them that this testimony was only for purposes of assessing Dennis' credibility, where she had denied making the statements. (**Id.** at 20-21.)

A related issue has already been addressed on direct appeal, where appellant argued that the trial court erred in denying his motion for mistrial after ADA Voci testified that Dennis had been threatened. **Commonwealth v. Black**, No. 1091 EDA 2008, unpublished memorandum at 5-6 (Pa.Super. filed April 20, 2009). This court affirmed on the trial court opinion. **Id.** at 7-8. Therein, the trial court explained that ADA Voci's testimony was admissible for impeachment purposes under Pa.R.E. 607(b). (Trial court

opinion, 8/4/08 at 20.)  In addition, the testimony was relevant to explain Dennis' change in her story.  (**Id.** at 21.)

As such, the matter could be considered previously litigated.  This court has already affirmed the trial court's decision to permit ADA Voci to testify regarding these threats.  Furthermore, the testimony was clearly admissible to explain Dennis' refusal to identify appellant at trial, and where she denied having been threatened.  There was no basis for objection.  In addition, appellant would be unable to prove prejudice where several other eyewitnesses, including two police officers, identified appellant as the gunman.  The Commonwealth's case was not dependent solely on the testimony of Dennis.  For these reasons, appellant's claim of trial counsel ineffectiveness fails.[2]

Having determined that appellant's issues are patently without merit and have no support in the record or from other evidence, the PCRA court did not err in dismissing appellant's petition without an evidentiary hearing.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/27/2014

---

[2] Several other issues raised in the PCRA court have been abandoned on appeal.

- 17 -